IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BRADFORD PABLO,

       Plaintiff,

vs.                                    Civ. No. 11-132 JB/ACT

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

   **THIS MATTER** comes before the Court on the Motion to Reverse or Remand the Administrative Agency Decision and Memorandum in Support of Motion to Reverse or Remand Administrative Agency Decision ("Motion") of the Plaintiff Bradford Pablo ("Plaintiff"), filed November 18, 2011 [Doc. Nos. 17 and 18].  The Commissioner of Social Security ("Defendant") filed a Response on January 20, 2012 [Doc. No. 20], and Plaintiff filed a Reply on February 16, 2012 [Doc. No. 21].  Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court recommends that the motion to remand be granted.

### I.  PROCEDURAL RECORD

   On March 13, 2006, Plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB") under Title  II of the Social Security Act, 42 U.S.C. §§ 401.  Plaintiff was

---

[1]       On Order of Reference [Doc. No. 9] was entered on February 25, 2011, referring this case to Magistrate Judge Alan C. Torgerson to conduct, hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

insured for benefits through December 31, 2007, and must show that he became disabled on or before that date. [Motion at 2, Tr. 112., 181]  Plaintiff alleges a disability beginning November 14, 2005, due to nerve damage to his left arm.  [Motion at 2, Tr. 107.]  His application was initially denied on July 14, 2006, and denied again at the reconsideration level on March 7, 2007. [Tr. 62, 67.]

The ALJ conducted a hearing on September 9, 2008. [Tr. 27-51.]  At the hearing, Plaintiff was represented by Attorney Michelle Baca.[2]  On December 4, 2008, the ALJ issued an unfavorable decision.  In his report, the ALJ found that through the date last insured, Plaintiff had severe impairments of brachial plexus injury and status-post leg surgery. [Tr. 12.]  In addition, the ALJ found that Plaintiff "has a non-medically determinable impairment of depression." [Id.]  The ALJ concluded that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Tr. 13.] The ALJ determined that through the date last insured, Plaintiff had the residual functional capacity to perform a full range of sedentary work as defined in CFR 404.1567(a). [Id.] The ALJ summarized that Plaintiff "can frequently and occasionally lift and/or carry ten pounds.  The claimant can stand and/or walk for two hours in an eight hour workday.  The claimant can sit for about six hours in an eight hour workday.  The claimant is limited in the use of his dominant left arm." [Tr. 14.]  In considering the claimant's age, education, work experience, and residual functional capacity, the ALJ determined "there were jobs that existed in significant numbers in the national economy that the claimant could have performed[.]"  [Tr. 16.]

---

Plaintiff is represented in his appeal by Attorney Michael Armstrong.

On December 11, 2010, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. [Tr. 1.] On February 10, 2011, the Plaintiff filed her Complaint for judicial review of the ALJ's decision. [Doc. No. 1.]

Plaintiff was born on January 29, 1978. [Tr. 107.]  The Plaintiff completed high school and has past work experience as an inventory specialist and warehouse worker. [Tr. 139, 142.] The claimant did not engage in substantial gainful activity during the relevant period of his alleged onset date of November 14, 2005, through his date last insured of December 31, 2007. [Motion at 2; Response at 1; Tr. 12, 107.]

## II.  STANDARD OF REVIEW

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  In order to qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).   Social Security

regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. §

404.1520.[3]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) to two inquiries: first, whether the decision was supported by substantial evidence; and

second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208,

1214 (10th Cir. 2004) (quotation omitted).  Substantial evidence is such evidence as a reasonable

mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the

record taken as a whole, and the court will "meticulously examine the record in order to

determine if the evidence supporting the agency's decision is substantial, taking 'into account

whatever in the record fairly detracts from its weight.'" *Id.*, quoting *Washington v. Shalala*, 37

F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute"

its opinion for that of the Commissioner.  *Hamlin*, 365 F.3d at 1214 (quotation omitted).

## III.  MEDICAL HISTORY

Plaintiff was 29 years old at the time he applied for DIB. [Response at 2.]  In applying for

DIB, Plaintiff stated he became disabled on November 14, 2005, due to his "[left] arm has nerve

damage/weak/painful" and pain in arms and legs. [Tr. 65, 67, 107, 138, 236, 237.]  Plaintiff

---

Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(C).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1183 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

described that he "can't grab anything on my left side.  I can't function very well on the left side.
I get pain from my arm.  Cannot do certain tasks that need 2 hands or all fingers." [Tr. 138.]
Plaintiff indicated that he stopped working in November 2005 because the job was completed
and he was laid off. [Id.]

Plaintiff is Native American and a member of the Navajo Tribe of Arizona, New Mexico
and Utah.  He received all of his medical care during the relevant period from Indian Health
Services.  The following represents Plaintiff's medical history prior to the date he was last
insured (December 31, 2007).

A.     **Brachial Plexus Injury**[4]

On July 16, 1998, Plaintiff was seen by B. P. Simmons at the Indian Health Services
("IHS") Chinle Hand Clinic for follow-up care after being in a motor vehicle accident five
months earlier in which he injured his left brachial plexus.  Plaintiff reported that "[i]nitial
paralysis L UE - has noted improvement [with] time.  No numbness in R hand." [Tr. 215.]
Following an examination, the care provider's impressions suggested that Plaintiff had a "L AC
[shoulder] separation and L brachial plexopathy, mostly C8-T1."  Plaintiff was sent to radiology
where x-rays indicated "[t]here is probably an AC separation.  Also, a triangular bony density
was seen partially overlying the humeral head." [Tr. 220.] B. P. Simmons diagnosed Plaintiff
with "brachial plexopathy L,[5] AC separation, and s/p dislocated L elbow." [Tr. 215.] Plaintiff
was advised to keep his joints supple and be reevaluated in three months. [Id.]

_____

A brachial plexus injury is an injury to the brachial plexus - the network of nerves that sends signals
from your spine to your shoulder, arm and hand.  A brachial plexus injury occurs when these nerves are stretched or,
in the most serious cases, torn. [Motion at 2, n.1.]

Brachial plexus dysfunction (brachial plexopathy) is a form of peripheral neuropathy. It occurs when
there is damage to the brachial plexus, an area on each side of the neck where nerve roots from the spinal cord split
into each arm's nerves.  See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002391.

On May 13, 1999, Plaintiff saw Dr. Charles Hamlin in the IHS Chinle Hand Clinic. Dr. Hamlin indicated Plaintiff had "nerve root avulsion with paralytic deformity" and was unable to pinch or grasp with his left hand.  [Tr. 214.] Dr. Hamlin recommended a tendon transfer which was scheduled for May 14, 1999.

On May 14, 1999, Plaintiff underwent a tendon transfer left forearm procedure at the IHS Chinle Hospital based on Dr. Hamlin's findings that Plaintiff had a "nerve root avulsion leading to loss of function of the C6 and C7 nerve roots.  He had no pinch and grasp.  He was able to flex and extend his elbow, flex and extend his wrist and partially extend his fingers." [Tr. 218.] Dr. Hamlin indicated that the Plaintiff "tolerated the procedure well." [Tr. 219] Dr. Hamlin prescribed Percocet for pain following the surgery. [Tr. 213.]

On June 17, 1999, the Plaintiff saw Dr. Elliot North in the IHS Hand Clinic post-surgically. [Tr. 212.]  His cast and sutures were removed, and his left arm was splinted.  Plaintiff was diagnosed with a "palsy Lt UE" and advised not to work for three to six months. [Id.] Plaintiff was scheduled for follow up in one week. [Id.]

On July 15, 1999, Plaintiff was examined by Dr. Hamlin for follow-up care status post multiple tendon transfers. [Tr. 211.]  Dr. Hamlin indicated ongoing occupational therapy. Dr. Hamlin diagnosed Plaintiff with brachial plexus palsy. [Id.]

On September 16, 1999, and again on December 16, 1999, Plaintiff presented to the IHS Hand Clinic for follow-up of his brachial plexus injury and status post tendon transfers. [Tr. 210, 209.] Plaintiff was complaining of hand and left arm weakness. [Tr. 210.] Dr. North recommended that Plaintiff "[s]ee Dr. Hamlin next visit to see if any more surgery is indicated." [Tr. 209.]

On February 17, 2000, Plaintiff saw Dr. Hamlin for follow up. [Tr. 207.] Dr. Hamlin recommended and subsequently performed a second surgery on February 18, 2000. [Tr. 216.] Dr. Hamlin recommended the second surgery based on his findings that Plaintiff "had a brachial plexus lesion with paralytic problem in the forearm distally and he had surgery to provide opening of the fingers and pinch and grasp. The operation was successful but he had intrinsic paralysis leading to clawing of the PIP joints." [Tr. 216.] Dr. Hamlin performed an "intrinsic tenodesis left hand with free tendon graft." [Id.] Dr. Hamlin indicated the patient tolerated the procedure well. [Id.] Dr. Hamlin prescribed Tylenol #3 for pain following the surgery.

From March 16, 2000, through July 20, 2000, Plaintiff had four follow-up visits status post intrinsic tenodesis. [Tr. 203-206.] Plaintiff was noted as have a good recovery from surgery and "may progress strengthening." [Tr. 204.]

On April 17, 2003, Plaintiff saw Dr. Hamlin for a follow-up at the IHS Chinle Hand Clinic status post tendon transfers for brachial plexus injury. [Tr. 202.] The record does not indicate any future procedures and/or treatments regarding Plaintiff's condition.

On June 6, 2006, Plaintiff presented to IHS for a "L hand assessment." [Tr. 235.] Plaintiff was noted as having an atrophied left upper extremity, an inability to extend his digits at PIPs, and no sensation on the volar pads of the digits. [Tr. 235.] Plaintiff had normal shoulder and elbow range of motion. [Id.] Plaintiff requested a functional hand splint, allowing active flexion. [Id.]

In an undated letter from Dr. Hamlin addressed "To Whom It May Concern" regarding Plaintiff's brachial plexopathy, Dr. Hamlin stated as follows:

> Mr. Bradford Pablo, a 29 year old male, is approaching a decade post MVA and cervical nerve root avulsions affecting the left dominant upper extremity. He underwent tendon transfers in May 1999 with minimal functional improvement.

He has significant muscle atrophy and residual pain.  He will not improve functionally and is limited to right (non-dominant) hand use.  Better pain management may help his pain.

I support his permanent disability claim.

[Tr. 240.]

### B.   <u>Leg Surgery</u>

On November 29, 2007, Plaintiff was taken by his family to the Medical Base in Thoreau, New Mexico, after he suffered an ankle injury while riding/wrecking a 4-wheeler. [Tr. 262.] Plaintiff was transported to the Gallup Indian Medical Center. [Id.] Plaintiff was examined in the emergency department, and x-rays confirmed that Plaintiff had a "comminuted fracture of distal tibia and fibular."  [Tr. 242, 258.] Plaintiff was provided with a splint and instructed to follow up with Dr. Mark Hopkins in the Orthopaedics Department. [Tr. 259.]  Plaintiff was prescribed Lortab 7.5 for pain. [Id.]

On December 1, 2007, Plaintiff presented at the Gallup Indian Medical Center Emergency Room complaining that he had slipped in the rain, twisted his right knee, and felt pain in his recently injured right ankle. [Tr. 254.] X-rays of his right tibia and fibula indicated no additional or further fracture. [Id.] Plaintiff was advised to elevate and ice his right leg and continue on pain medication. [Id.] He was scheduled to see an orthopedic surgeon on December 4. 2007. [Id.]

On December 4, 2007, at 9:25 a.m. Plaintiff was evaluated in the Gallup Indian Medical Center Orthopedic Clinic. [Tr. 253.] A splint was reapplied with manipulation and Plaintiff was advised to follow up with Dr. Hopkins. [Id.]

On December 4, 2007, at 3:05 p.m., Plaintiff presented at the Gallup Indian Medical Center after falling again and injuring his right leg. [Tr. 252.] Plaintiff's splint was found to be dry and intact. [Id.] X-rays revealed no changes from his morning evaluation. [Id.]

On December 11, 2007, Plaintiff followed up at the Gallup Indian Medical Center Orthopedic Clinic. [Tr. 250.] Plaintiff reported his pain was decreasing. [Id.] The splint was removed and Plaintiff was placed in a lower leg cast. [Id.] X-rays showed excellent alignment and position. [Id.] Plaintiff was prescribed Lortab 7.5 for pain. [Id.]

      **C.**     <u>**Depression**</u>

The Transcript of Administrative Record contains only one record during the relevant period of time that indicates Plaintiff presented to IHS for a behavioral health visit. On December 11, 2007, Plaintiff was a "walk-in" at Medical Social Services and presented with a chief complaint that states, "suppressed for confidentiality." [Tr. 247.]

## IV. DISCUSSION

      **A.**     <u>**Step Four Findings and ALJ's Credibility Determination**</u>

An ALJ proceeds to step four in the five-step analysis only after first finding a severe impairment at step two, and then finding at step three that the impairment(s), if listed, does not conclusively find the claimant disabled. See 20 C.F.R. §§ 404.1520(e), 416.920(e); *see also Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). Here at step two, the ALJ determined that through the date last insured, the Plaintiff had severe impairments of "brachial plexus injury and status-post leg surgery" [Tr. 12.] At step three, the ALJ found that Plaintiff's severe impairments were either not listed or were not medically equal to the criteria of impairment listings necessary to conclude Plaintiff to be disabled. [Tr. 13.] The ALJ then proceeded to the step-four analysis.

The step four analysis is comprised of three phases.

In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), . . . , and in the second phase, [s]he must determine the physical and mental demands of the claimant's past relevant work. . . . In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. At each of these phases, the ALJ must make specific findings.

*Winfrey v. Chater*, 92 F.3d 1017, 1012 (10th Cir. 1996) (citations omitted). At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform sedentary work, albeit that Plaintiff is limited in the use of his dominant left arm. [Tr. 14.]

In determining a claimant's physical abilities, the ALJ should "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The ALJ is required to consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. §§ 404.1545(d) , 416.945; *see also Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010).

In making his RFC determination here, the ALJ considered each of the Plaintiff's severe impairments – brachial plexus injury and status-post leg surgery. However, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] alleged symptoms are not credible *to the extent they are inconsistent* with the above residual functional capacity assessment." (Emphasis added.) A troubling first impression of this statement, if taken at face value, is that the ALJ appears to be putting the cart before the horse. A RFC determination is made *after* the ALJ considers each of the Plaintiff's severe and nonsevere impairments; an ALJ does not make an RFC determination and then conclude that a claimant's

alleged symptoms of those impairments are inconsistent with a determination already made, as the ALJ appears to be doing here.

Plaintiff argues that the ALJ's credibility determination is unsupported by substantial evidence and is legally deficient under the Tenth Circuit's ruling in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).[6] [Motion at 3.]  Having found that the Plaintiff met the first and second prong of the three-party inquiry under *Luna* (that his medically determinable impairments could reasonably be expected to cause some of his alleged symptoms), Plaintiff contends that the ALJ then found that Plaintiff's allegations of disabling pain were not credible because of his daily activities. [Motion at 4.] Plaintiff asserts that the ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain. [Id.]

In response, Defendant argues that Plaintiff failed to meet his burden of proof that his "subjective complaints are so severe that they preclude any substantial gainful activity." [Response at 5-6.] Defendant contends that the ALJ did not solely rely on the Plaintiff's minimal daily activities in determining Plaintiff's credibility, but included (1) inconsistencies between Plaintiff's complaints and his medical reports; (2) conflicting statements regarding his ability to drive; (3) Plaintiff was able to travel; and (4) that even though Plaintiff sustained his brachial plexus injury in 1997, he continued to work until November 14, 2005. [Response at 6-7.] Defendant asserts that these inconsistencies weigh against a plaintiff's credibility and that substantial evidence supports the ALJ's credibility findings.

---

[6] The framework for the proper analysis of Claimant's evidence of pain is set out in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).  We must consider (1) whether claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.  *Luna v. Bowen*,  834 F.2d 151, 163-64 (10th Cir. 1984).

"Findings as to credibility should be closely and affirmatively linked to substantial evidence . . . ." *Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir. 1996) (*quoting Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)). "Credibility determinations are peculiarly the province of the finder of fact, [however,] and we will not upset such determinations when supported by substantial evidence." *Id. (quoting Diaz v. Secretary of Health & Human Servs*., 898 F.2d 774, 777 (10th Cir. 1990)). "A claimant's subjective allegation of pain is not sufficient in itself to establish disability. Before the ALJ need even consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir. 1996) (internal citations omitted). Here, the Plaintiff met this initial burden. In this case, there is objective medical evidence in the administrative record establishing that Plaintiff has pain-producing brachial plexopathy and a status-post leg injury. The ALJ is then required to consider all the relevant objective and subjective evidence and "decide whether he believe[d] the claimant's assertions of severe pain." *Id.* (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987). The ALJ must cite to specific evidence relevant to the factors used in evaluating a claimant's subjective complaints, and explain why if she concludes those complaints are not credible. *See Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995)*.*

When determining the credibility of pain testimony, the ALJ should consider such factors as:

> [T]he levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between claimant and

other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Thompson v. Sullivan*, 987 F.2d 1482. 1489 (10ᵗʰ Cir. 1993) (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10ᵗʰ Cir. 1991) (quoting *Huston v. Bowen*, 838 F.2d 1125, 1132 and n. 7 (10ᵗʰ cir. 1988)).

Here, the ALJ addresses a number of concerns to support his assessment of Plaintiff's credibility.

First, the ALJ states that the Plaintiff was able to travel out of state since the alleged onset date of November 14, 2005, and argues that the ability to travel suggests that the Plaintiff has overstated his alleged symptoms and limitations. [Tr. 14.]  To support his argument, the ALJ points to a Gallup Indian Health Services medical record dated November 23, 2006. [Tr. 231.] In that record, Plaintiff presented with symptoms of bronchitis and reported left upper extremity pain. [Id.] Plaintiff apparently reported to the attending care giver that he was "returning to Phoenix, AZ 11/27/2006" and was advised to follow up with his doctor in Phoenix.  [Id.]

Second, the ALJ states that on December 11, 2007, Plaintiff reported he had "no pain" associated with the tibia and fibular fracture he suffered on November 29, 2007.  The ALJ also states that the record indicated there was "excellent alignment." [Tr. 14.] The ALJ concludes that even though the Plaintiff had a cast for his ankle, he would only be prevented from working for about two months. [Id.] In addition, the ALJ concludes there is no indication that Plaintiff's lower left leg injury was permanent and that the "[i]maging of the claimant's spine and ankle has been fairly normal, not indicating any serious limitations." [Id.]

Third, the ALJ asserts that the Plaintiff stopped working for reasons not related to his alleged disabling impairment. [Tr. 15.]  In addition, the ALJ asserts that because there is no

evidence of a significant deterioration in the Plaintiff's medical condition since he was laid off, a reasonable inference "is that the claimant's impairments would not prevent the performance of that job, since it was being performed adequately at the time of the layoff despite a similar medical condition." [Id..]

Fourth, the ALJ argues there is an inconsistency in Plaintiff's stated ability to drive. [Tr. 15.]  In the Plaintiff's Function Report, Plaintiff reported he was able to drive, while at the hearing Plaintiff reported he was unable to drive because the pain in his left arm made it too difficult. [Id.]

Finally, the ALJ addresses Plaintiff's activities of daily living and concludes that they "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  The ALJ notes that Plaintiff is able to help his parents around the house, take care of his dogs, prepare simple meals, perform light housework, go outside several times a day, drive, shop with his parents weekly for groceries, watch television, talk on the phone, groom himself, and care for his son ("which can be quite demanding"). [Tr. 15.]  The ALJ determined that Plaintiff's ability to engage in these activities "shows he has few actual limitations." [Id.]

The ALJ's evaluation of Plaintiff's credibility is not supported by substantial evidence for a number of reasons.

First, travel in itself is not inconsistent with disability, particularly when the ALJ, as here, can point to only one example of travel from the date of injury through the date last insured. Plaintiff's ability to sit in a car for one trip from Gallup, New Mexico, to Phoenix, Arizona, is not evidence of an ability to engage in prolonged physical activity.  *See Broadbent v. Harris*, 698 F.2d 407, 413 (1983) (finding that yardwork, performing household tasks, working on cars, and

taking occasional trips are not diversions that establish, without more evidence, that a person is able to engage in a "substantial gainful activity.").

Second, with respect to Plaintiff's follow-up visit to Gallup Indian Medical Center on December 11, 2007, for his ankle injury, the record indicates Plaintiff reported "pain ↓ing," *not* "no pain" as stated by the ALJ.  [Tr. 250.]  And with respect to the "excellent alignment" relied upon by the ALJ as an indication that Plaintiff has no limitations as a result of his ankle injury, the note – "excellent alignment and position" -- appears to be made in reference to x-rays taken after the removal of a splint and placement of a lower leg cast. [Id.]  It does not speak to the final level of Plaintiff's outcome as implied by the ALJ.  In addition, the ALJ's comments that there is no indication that Plaintiff's injury was permanent and that the "[i]maging of the claimant's spine and ankle has been fairly normal, not indicating any serious limitations" are conclusory.

Third, although the ALJ asserts that the Plaintiff stopped working for reasons not related to his alleged disabling impairment, the record reflects additional information regarding Plaintiff's being "laid off" not addressed by the ALJ.  Plaintiff reported to Social Security that the reason he stopped working was because the "[j]ob was completed/laid off." [Tr. 138.] However, Plaintiff also reported to Social Security that his injuries had affected his job duties and that his employer had to make job-related changes related to his injuries; i.e., Plaintiff reported he could not use any type of sharp power tools because he had no feeling in his left arm; heavy objects had to be lifted by someone else; and other employees were required to assist him. [Id.] At the Administrative Hearing, Plaintiff testified that he stopped working when his job working in the warehouse was moved to working in the field. [Tr. 27-28.] "They moved me into the field, which I couldn't really lift heavy objects and do heavy things, so that's why I also left." [Tr. 27.] "[T]hey moved from the warehouse to the field, which the field was very – it was really

hard work.  It was pretty hard, lifting heavy objects.  That's why I really couldn't take it anymore.  Once I did start working I'd get major cramps in my left arm from trying to do things like two hands, and I couldn't do it.  I started getting more pain in there." [Tr. 28.] Thus, while Plaintiff indicates he was "laid off," a review of the entire record suggests that Plaintiff also stopped working because he could no longer perform the work required by his employer.

The ALJ's assertion that he could reasonably infer that "the claimant's impairments would not prevent the performance of that job, since it was being performed adequately at the time of the layoff despite a similar medical condition" is unsupported.  The Plaintiff testified that he was not performing his job adequately when he was laid off and "left" his job as discussed above.  The Plaintiff also testified that his attempts to find work after he was laid off were futile because he had the same disabling limitations in looking for work that impacted his ability to continue working at the job he left. [Tr. 29.]

The ALJ's assertion that "there is no evidence of a significant deterioration in claimant's medical condition since [his] layoff" is also unsupported.  The medical records before Plaintiff's layoff reflect that Plaintiff's medical condition was focused primarily on "brachial plexus lesion with paralytic problem in the forearm distally" and an inability to "open the fingers and pinch and grasp." [Tr. 209-219.]  The medical records after Plaintiff's layoff, though sparse, evidence that Plaintiff's entire left upper extremity is atrophied – a significant deterioration in the Plaintiff's condition.  On March 31, 2006, Field Officer C. Bunnell completed a Disability Report - Field Office (Form SSA-3367), in which he observed Plaintiff's "[l]eft hand curled up. Not able to use this arm well at all.  Cannot lift with this arm.  Arm not used.  Can lift up at shoulder but cannot use.  Observed this during interview." [Tr. 127.]  On June 6, 2006, Plaintiff was noted at IHS as having an atrophied left upper extremity, an inability to extend his digits at

PIPs, and no sensation on the volar pads of the digits. [Tr. 235.] On November 23, 2006, Plaintiff reported left upper extremity pain and was prescribed Lortab for pain. [Tr. 231.] Dr. Hamlin's "To Whom It May Concern" letter indicates that Plaintiff "has significant muscle atrophy and residual pain.  He will not improve functionally and is limited to right (non-dominant) hand use.  Better pain management may help his pain." [Tr. 240.]  Although this letter is undated, it states that Plaintiff is approaching a decade post-MVA.  The accident was in early 1998.  Thus, this letter was likely penned in 2007.  All of the records dated after Plaintiff stopped working evidence that his medical condition had deteriorated.

Fourth, the ALJ's argument regarding the inconsistency in Plaintiff's stated ability to drive is easily explained by the passage of time.  The Function Report was completed in March 2006, while the Administrative Hearing was held in September 2008.  Defendant's Response acknowledges this explanation, but states that "Plaintiff ignores that as late as November 29, 2007, he was driving a 4-wheeler, which calls into serious doubt his inconsistent testimony that he had been unable to drive for about a year." [Response at 9.]  Driving a 4-wheeler is not synonymous with driving an automobile.  That said, the fact that Plaintiff testified he had not been driving for "give or take about a year" and it turns out to be 10 months is not so great an inconsistency to call Plaintiff's credibility into "serious doubt."

Finally, the ALJ's conclusion that Plaintiff's activities of daily living "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" is unsupported.  The ALJ relies on information from three different Function Reports – two that are self-reporting by Plaintiff and one from a third party (Plaintiff's father).  The first Function Report, though undated, was presumably completed around the time Plaintiff first filed for disability benefits on March 13, 2006. [Tr. 129-136.]  Based on the information contained

therein, Plaintiff was living with his fiancé and his nine year old son at that time.  The second

Function Report is dated February 7, 2007, and Plaintiff was assisted in filling it out by his

father. [Tr. 165-172.]  Based on the information in the second report, Plaintiff was then living

with his parents.  To the extent there is conflicting and/or supplemental information in each of

these reports, the ALJ appears to rely on the information that best supports his conclusion.  For

example, the ALJ states that Plaintiff can groom himself because in the first Function Report,

Plaintiff checked a box that indicates he has "NO PROBLEM with personal care." [Tr. 130.]  In

the second Function Report, however, Plaintiff still checked the box that indicates he has "NO

PROBLEM with personal care," but further explained that he needs assistance with dressing,

such as tying his shoes and buttoning his shirt; he needs help with bathing; and someone has to

cut his meat and butter his bread during meals.  Plaintiff is able to wash his hair, shave, feed

himself and use the toilet using only one hand.  [Tr. 166, 172.] The third-party report completed

by Plaintiff's  father repeats similar information. [Tr. 174.] Another example is where the ALJ

relies on information in the first Function Report that makes mention of the Plaintiff taking care

of his son; i.e., "I make his snacks.  I play with him.  Help him with his homework," [Tr. 130] to

which the ALJ adds his own commentary that this  "can be quite demanding." [Tr. 15]

However, the second Function Report makes no mention of his son's presence in the household

at all.  The Court has already addressed the ALJ's reliance on the first Function Report to

support his determination that the Plaintiff can drive, even though the Plaintiff testified to the

contrary at the Administrative Hearing.  As to the remaining daily activities noted by the ALJ,

none of the activities listed (feeding dogs, preparing lunch, watching television, and helping

parents around the house) involve prolonged physical activity to establish that Plaintiff is able to

engage in "substantial gainful activity."  *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir.

1993) (finding that the ALJ may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain); and see *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983).

For all of the foregoing reasons, the ALJ's credibility determination is unsupported by substantial evidence.  This is error.

   **B.      Duty to Develop the Record**

Plaintiff argues that the ALJ failed to develop the record as he did not understand the findings of treating physician Dr. Charles Hamlin.  Because the ALJ gave "little weight" to Dr. Hamlin's opinion, Plaintiff asserts that the ALJ should have tried to understand what Dr. Hamlin meant by "permanent disability" and the objective findings underlying his diagnosis by recontacting him or ordering a consultative exam.  Plaintiff concludes that the ALJ erred in not developing the record.

In response, Defendant argues even though the ALJ states he gave "little weight" to Dr. Hamlin's opinion, he actually agreed with Dr. Hamlin's assessment that Plaintiff was limited to use of his right, nondomimant hand, and evidenced this by stating in his hypothetical to the vocational expert that Plaintiff's left arm could only be used for guiding or helping the right arm. [Response at 10.]  Because the ALJ did not reject or weigh the evidence unfavorably in order to determine the Plaintiff's residual functional capacity, Defendant further argues there is no need for the ALJ to support his findings with an express analysis. [Id.] In addition, Defendant asserts that the ALJ was only rejecting Dr. Hamlin's suggestion that Plaintiff was permanently disabled, a determination reserved for the Commissioner.  The Defendant contends that when the evidence in the record is adequate to make a disability determination, there is no duty to recontact a treating physician.  Finally, the Defendant argues that the ALJ's duty to investigate only extends

to issues asserted by Plaintiff or Plaintiff's representative and that Plaintiff's attorney did not request any further development of the record. [Response at 12.]

Here, the ALJ states that "Although Dr. Hamlin is a treating provider, I give little weight to his opinion. Dr Hamlin did not provide any objective evidence to support his decision of permanent disability concerning the claimant's limited use of his left upper extremity. Instead, he seemed to rely mostly on self reporting from the claimant." [Tr. 15.] Although the Defendant argues that the ALJ was only "rejecting" Dr. Hamlin's assessment that the Plaintiff was permanently disabled, the Court does not agree. Dr. Hamlin's letter explicitly states that Plaintiff "has significant muscle atrophy and residual pain. He will not improve functionally and is limited to right (non-dominant) hand use. Better pain management may help his pain. I support his permanent disability claim." [Tr. 240.] The ALJ's conclusion and inclusion in his hypothetical to the vocational expert that Plaintiff's left arm can be used for guiding or helping the right arm is questionable and not based on Dr. Hamlin's opinion. Dr. Hamlin's opinion states that the Plaintiff is limited to right (non-dominant ) hand use and makes no mention of Plaintiff's ability to use his left arm at all, limited or otherwise, in light of his muscle atrophy. In addition, the ALJ did not account for the Plaintiff's residual pain as a result of his left upper extremity muscle atrophy, thus rejecting Dr. Hamlin's opinion in this regard.

The Court also does not agree with the Defendant's argument that the ALJ in this case did not have a duty to recontact Dr. Hamlin. The facts here are unlike the facts in *White v. Barnhart*, 287 F.3d 903 (10th Cir. 2002), cited to by the Defendant wherein that court found that the ALJ did not err in not recontacting the treating physician. In that case, the ALJ believed the information he received from the treating physician was adequate for consideration and not so incomplete that it could not be considered in determining disability. *White*, 298 F.3d at 908.

Thus, the presence and availability of information was not the issue, it was the ALJ believing that the treating physician had reached a wrong conclusion in spite of providing adequate information. *White*, 287 F.3d at 908. Here, the ALJ affirmatively states "Dr. Hamlin did not provide objective evidence to support his [opinion]." This is a clear indication of the absence of adequate information from which to make an informed determination.

The facts here are also unlike the facts in *Maes v. Astrue*, 522 F.3d 1093 (10th Cir. 2008), cited to by the Defendants wherein the court found that the ALJ did not have a duty to develop the record where the claimant had failed to even list her treating physician as one of her physicians on her application for benefits, and never mentioned him in post-application interviews. *Maes*, 522 F.3d at 1097. In that case, even the claimant's counsel failed to make any effort to point out the existence or relevance of claimant's treating physician. *Maes*, 522 F.3d at 1097. Here, Plaintiff reported to Social Security when asked to "List each Doctor/HMO/ Therapist" that he had been seen by IHS Chinle where he was treated by Dr. Hamlin. [Tr. 141, 160, 186.] Plaintiff also testified at the Administrative Hearing that Dr. Hamlin was his treating physician. [Tr. 42.] In addition, Plaintiff's counsel submitted a brief to the Appeals Council following the ALJ's unfavorable decision on December 4, 2008, in which she pointed out the ALJ's failure to give the appropriate weight to Plaintiff's treating physician, Dr. Charles Hamlin. [Tr. 196-98.] The Appeals Council subsequently upheld the ALJ's decision. [Tr. 1.] Thus, unlike the facts in *Maes* where the ALJ was completely uninformed about a treating physician, here the ALJ was well informed about Plaintiff's treating physician.

Finally, the medical records available in the Transcript of Administrative Hearing reflect obvious gaps of information regarding Dr. Hamlin's treatment of Plaintiff after Plaintiff's initial diagnosis of brachial plexopathy and his two hand surgeries. One explanation is found in

Plaintiff's testimony at the Administrative Hearing on September 9, 2008, where he stated that Dr. Hamlin was his treating doctor, but that "[s]ince the gas prices went up, I hardly went down to go see him."  That said, Plaintiff testified he had seen Dr. Hamlin in the last year or two, and "when I did see him he looked at my arm and he told me the way he said himself, that's the best I could do.  There's nothing else I could do for you to make your arm move around and function better."  [Tr. 42.]

"The ALJ has a basic obligation to every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993) (internal citations omitted).  The ALJ, under the governing regulations, must recontact a treating physician when information the doctor provides is inadequate . . . to determine whether [the claimant is] disabled.  20 C.F.R. § 416.912(e).  The inadequacy of the evidence received from the treating physician triggers the duty to recontact.  *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).  The ALJ erred in not recontacting the treating physician for additional information, or requesting a diagnostic evaluation from him or another physician.

### C.    Step Five

The Court will not address Plaintiff's remaining claims of error at step five.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

### RECOMMENDED DISPOSITION

For the reasons discussed above, I recommend finding that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision [Doc. 17] be granted.

Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(c).  Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to  § 636(b)(1)(c), file written objections to such proposed findings and recommendations with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen (14) days period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**ALAN C. TORGERSON**
**United States Magistrate Judge**